No. 39,954

WALTER F. WOLF and MYRTLE B. WOLF, *Appellees,* v. THE SECOND DRAINAGE DISTRICT OF FINNEY COUNTY, KANSAS, *Appellant.*

(298 P. 2d 305)

Opinion filed
June 9, 1956.

*Daniel R. Hopkins,* of Garden City, argued the cause and *Ray H. Calihan, Logan N. Green* and *Ray H. Calihan, Jr.,* all of Garden City, were with him on the briefs for the appellant.

*Charles S. Fisher, Jr.,* of Topeka, argued the cause and *T. M. Lillard, O. B. Eidson, Philip H. Lewis, James W. Porter,* and *Sidney C. Hunt,* all of Topeka, and *Dale H. Corley* and *Clyde P. Daniel,* both of Garden City, were with him on the briefs for the appellees.

The opinion of the court was delivered by

SMITH, C. J.: This *is* an action for damages for land alleged to have been taken by the defendant to clear an alleged natural watercourse through plaintiffs' land, pursuant to the provisions of G. S. 1949, 24-401. Judgment was for plaintiffs. Defendant has appealed.

The amended petition alleged the ownership by them of a section of level farming land; that the drainage district on April 5, 1953, proceeded with the construction of the ditch through the section without acquiring it by dedication, gift, purchase or through eminent domain proceedings, and without any compensation to plaintiffs; the dimensions of the ditch were set out and amounted altogether to 15.4 acres, of which 6.31 were dry land, the reasonable value of which was $200 per acre, and of which 9.4 were irrigated with a crop of growing wheat thereon, the reasonable value of which land was $300 per acre; that the ditch cut across level valley land of the plaintiffs in such a manner as to isolate more than one half of their land from the balance of their farm land and farmstead, and in doing so isolated about 64 acres of irrigated land from their

irrigation system and caused such 64 acres of irrigated land to be converted into dry land; that as a result the crop of wheat was damaged and they had suffered crop damage; that to use this isolated acreage even as a dry land farm it would require a bridge to transport farm machinery across the ditch and would result in continuous inconvenience and expense to them; that the ditch as constructed isolated approximately 239 acres of dry farm land from the balance of their land and in order to use this acreage it would require an additional bridge to transport farm machinery; that the ditch had isolated the pastureland located in the southeast corner from the feed lot, well and other improvements placed thereon, and as a result they would be required to move their improvements to the pasture land so that the pasture could be utilized and their cattle be cared for properly; that in connection with their diversified farming activities and the grazing of cattle on this land and as a result of the construction of this ditch and in order to use the land in the most productive manner they must construct approximately 2.6 miles of fence; that the actual construction of the ditch over and across their land would result in a substantial decrease in the value in that their remaining land had been and would be further damaged through erosion by wind blowing the waste material from the ditch over plaintiffs' land and by water in the ditch eroding away the banks of the ditch and eating into plaintiffs' remaining land; that thistles, grass, bindweed and other weeds and weed seeds have been and will continue to be carried in the ditch through or upon plaintiffs' land, rendering it less valuable and less productive; that plaintiffs' land will be subjected to increased flood hazard in time of high water as a result of water backing up in the ditch from the Arkansas River, located at the terminus of the ditch less than a mile away, joining with that water which will come down the ditch from the north; that the fair market value of their land prior to the taking of a part was $126,875 and the fair market value of their remaining land after the taking of a portion of the original farm was $90,587.50; that they had and would suffer damage and injury on account of the value of dry land taken $1,200; value of irrigated land taken $2,700; difference in value of their land not taken immediately before and immediately after the taking $36,287.50.

Judgment was asked for $40,187.50.

The defendant in its answer admitted the organization of the district and the ownership of the property by plaintiffs; denied that

the land was level farming land and denied the rest of the petition. The answer then alleged there had existed for many years in the area now comprising the Second Drainage District of Finney County, a natural watercourse named White Woman Creek; an intermittent stream flowing water during periods of rainfall and a high undersurface water table, and running dry during periods in which rainfall was sparse; that when rainfall was less than normal the watercourse remained dry, running water intermittently and with periods elapsing between the periods when water ran in said watercourse; that it ran in a southeasterly direction from the northern part of the area now comprising the Second Drainage District of Finney County, Kansas, through the area to the southern part, emptying into the Arkansas River at a point located in the southern portion of the area; that during the periods when the watercourse did not run water the farmers and others owning and leasing land along the watercourse by cultivation, land leveling, dumping of dirt, debris and other means erased the banks of the watercourse, cultivated the channel thereof and converted its channel and banks into dry and irrigated farm land at various points along the watercourse and particularly in the southern portion thereof; that as a result of the elimination of the channel at various places, water which ordinarily would have flowed through it during periods of rainfall was caused to collect in lakes and ponds along portions of it at such points so as to cause lakes and ponds to exist, land to become swampy and unfit for cultivation, alkali deposits to accumulate and mosquitoes to breed in the stagnant water resulting therefrom; that although its banks and channel had been erased at various places during periods of rainfall, water flowing in it sought its way to the Arkansas River and in so doing followed the original channel, spreading out over adjacent lands; that during the years 1949 and 1950 rainfall occurred in the vicinity of the area and caused the lakes, ponds and swamps to increase in size and to render the area adjacent to be damaged and detrimental to the public health; that as a result of the damage caused by such water residents and owners of property located in the area, including plaintiff, Walter F. Wolf, met at various meetings to determine what course of action should be pursued to eliminate the damage created and to prevent its recurrence; that as a result of the meetings it was determined by Wolf and others that a drainage district should be formed to clear the channel of the watercourse and to

build levees, drainage ditches and other works in connection therewith to eliminate the danger of overflow from the watercourse; that a petition for the formation of the district was signed by plaintiff Wolf and others, a copy of which was attached to the answer; that it was presented to and filed with the board of county commissioners on the 6th day of August, 1951, and notice given as provided by law; that on the 15th day of August a hearing was had before the county commissioners; that as a result of the hearing an order was issued by the board of county commissioners wherein the allegations contained in the petition were found to be true and an order was made under the provisions of G. S. 1949, 24-406, in which defendant was declared to be a body politic; that such order was conclusive and binding on all persons and all matters and things therein contained were *res judicata* as to the parties to this action and all other persons; that an election was held and directors were elected and bonds issued for the payment of the cost of the work; that the watercourse did flow through the lands of the plaintiffs but that plaintiffs and their predecessors at various times during dry years, by cultivation, land leveling, dumping of dirt and other means erased its banks; placed constructions therein and farmed the channel so that water normally flowing through it in plaintiffs' lands was prevented from so flowing except during periods of high water, when the water flowed and spread out over plaintiffs' lands in attempting to find its way to the Arkansas River; that defendant in its work of cleaning the channel and removing obstructions therefrom entered it as it flowed through plaintiffs' land and deepened the channel thereof and removed dirt, debris and other obstructions placed therein and provided a channel for it to permit the flow of water through it; that the channel so provided assumed substantially the dimensions alleged in the petition; that in entering it as it ran through plaintiffs' lands defendant did not take or appropriate any of plaintiffs' lands or other property nor did it widen it over the original channel of the same; that under the provisions of G. S. 1949, 24-401, *et seq.*, as amended, defendant had the duty, right and power to enter it and make such improvements and to accomplish the works performed without compensation to plaintiffs; that in all meetings referred to plaintiff Wolf acted for himself and for his wife, Myrtle, plaintiff, and he was the duly authorized and acting agent for her with reference to the disposition of plaintiffs' land; that he signed the petition with full knowledge of its

contents and the drainage district relied on their acquiescence and consent and that of others in the formation of the drainage district and defendant did not know that plaintiffs objected to the clearing of the watercourse until after the contract to commence the work had been let; that prior to the clearing of the channel through plaintiffs' lands they, during the years of high water, were subjected to flooding and overflow of the watercourse and plaintiffs' crops and other property were damaged; that the improvements made by defendant would prevent the flooding of plaintiffs' land and crops and permit plaintiffs to farm the lands without flooding and overflow. The prayer was that plaintiffs take nothing by their action.

The petition for the organization of defendant drainage district, a copy of which was attached to the answer, described the property by metes and bounds and prayed it be incorporated as a drainage district under the corporate name of "The Second Drainage District of Finney County, Kansas."

The order of the county commissioners after reciting facts, about which there is no dispute, found that the petitioner had acted in conformity with the statutes and that all allegations of the petition were true. It ordered the territory described in the petition and taxpayers and residents therein constitute a public corporation under the name "The Second Drainage District of Finney County, Kansas." A board of directors was elected.

The plaintiffs in their reply alleged a general denial and denied specifically that Walter F. Wolf had at any time acted as the agent of his wife.

There was a somewhat lengthy pre-trial conference. After stating the allegations of the petition, counsel for plaintiff stated: "In brief, it is our position that this is just a taking of land, private property, for a public purpose without compensation, in violation of the Constitution of the United States, and in violation of the statutory law of the State of Kansas." Counsel for defendant after referring to the allegations of the answer stated:

"We have alleged in our answer that these plaintiffs and all of them knew from the first inception of this thing exactly what was taking place. That they sat idly by and permitted all of these things to be done. In other words, we have alleged estoppel, among other things."

Counsel for defendant further stated:

"I think the court—if the court will read the statute, 24-407 as amended, the court will find that the drainage district formed under the provisions of this act is given control, exclusive control of all natural watercourses in the

district, and is given the power to clear the channel of the watercourse, remove debris, build levees and to condemn obstacles which appear."

There followed a somewhat lengthy discussion between counsel in which counsel for plaintiffs stated:

"We don't think it is incumbent upon us to prove that there did or did not exist a natural watercourse somewhere in the district. We thing it is enough if we show there was no watercourse and that private property was taken along the path of the present ditch, and as a result these various plaintiffs were damaged."

Counsel for plaintiffs stated they did not deem it material whether a watercourse existed because they expected to prove that if there ever was a watercourse it did not exist at any point where the ditch was constructed. The following colloquy occurred:

"Mr. Hopkins: . . .

"This Drainage District has not only the power, but it has the duty to take exclusive control of this watercourse, to clear the channel of the watercourse and to remove obstacles from it. To condemn and remove obstacles from it, is what the statute says. In so doing they are not taking any property of the landowner.

"Mr. Fisher: If they stay in the watercourse.

"Mr. Hopkins: If they take any property in addition to the watercourse, they must pay for it. I think that the plaintiff is in agreement on that point, Your Honor.

"The Court: I wondered how badly off I am on the law.

"Mr. Fisher: Going further, the sole issue in this case, as we see it, is whether or not there was a natural watercourse along the path of the ditch though [sic] these plaintiffs' farms, and if there wasn't, then I think you will admit you have made a channel through there.

"Mr. Hopkins: Certainly. There is no question about that."

In a pre-trial order the trial court held:

"Apparently, the parties are not in agreement as to the burden of proof. Again I am handicapped by lack of the pleadings, but it would seem that inasmuch as the plaintiffs are claiming damages for land taken, and having so shown, the burden shifts to the defendant to show otherwise.

"On page 56 of the transcript, the court is again asked to rule on the effect of the order of the board of county commissioners as to whether such order in finding that a natural watercourse ran through the lands of these plaintiffs is binding and conclusive on the plaintiffs as to the existence of such watercourse. Apparently, plaintiffs have admitted that such watercourse did run through their lands, only contesting the location of the channel itself; but the petition for the organization of the district and the orders made pursuant thereto as provided by G. S. 24-406 will be held to be conclusive on all persons. The court has not seen either of these papers.

"The plaintiffs are not estopped from claiming damages for loss of land or for damages to remaining land, irrespective of whether they had or did not

have knowledge of the plans of the defendant for the construction of the waterway, or as to when any such plans were made by the defendant, or what the plans provided. The corporation had the power to go upon the lands and to do the things authorized by G. S. Supp. 24-407 and plaintiffs were powerless to interfere with the defendant's actions.

"Again let me say, in the hope that it will limit and clarify the issues, that my present view of the law is that it makes little difference whether or not a natural watercourse ran through the lands of the plaintiffs. The title to the watercourse, including the bed and the banks thereof, is in the plaintiff; and the taking thereof for public use, even by a corporation in which the plaintiff may be a stockholder or member, entitled the plaintiff to compensation. If I am wrong in this, I stand ready to be corrected."

At the conclusion of the opening statement of counsel for plaintiffs, defendant demurred to it on the ground that it failed to reveal the location of any natural watercourse through the land of plaintiffs and the court was bound by the presumption that such natural watercourse did exist. This demurrer was overruled. At the conclusion of all the evidence each party asked that the jury be instructed to bring in a verdict in their respective favors. These motions were overruled.

The jury returned a verdict for plaintiffs and fixed the amount at $18,083.

In due time defendants filed a motion for a new trial on the ground it was not afforded a reasonable opportunity to present its evidence and be heard on the merits; erroneous rulings of the court; erroneous instructions given by the court; that the court erred in certain specific instructions given and in refusing certain instructions requested; in overruling defendant's demurrer to plaintiffs' opening statement; in overruling defendant's motion for an instructed verdict; erred in the admission of evidence; in refusing to permit the jury to read or have read to it certain exhibits; in submitting only one form of verdict to the jury. This motion for a new trial was overruled. The appeal was from the order overruling defendant's demurrer to the opening statement of plaintiffs; the overruling of defendant's motion for an instructed verdict from the judgment; and from the order overruling its motion for a new trial.

Defendant first argues the trial court erred in giving instruction No. 4. That instruction was as follows:

"You are instructed it is immaterial in your consideration of this case as to whether a natural watercourse existed through the land of the plaintiffs. You are further instructed that the beds and banks of a non-navigable stream

are private property subject to the exclusive appropriation of the owner, and he may in the course of his farming operations cause the banks and channels thereof to be erased and to alter its course, so long as he doesn't alter its course as it enters his property from the land of another to the other's damage, or doesn't change its course as it leaves his land onto the property of another to the other's damage. He may not obstruct or cause the obstruction of the flow of waters so that such waters will dam up and overflow the lands of others."

Our attention is called to the first sentence of the above: "You are instructed it is immaterial in your consideration of this case as to whether a natural watercourse existed through the land of the plaintiffs." Here an examination of the issues made by the pleadings becomes necessary. Briefly, the plaintiffs stated in their petition the defendant took their land for a drainage ditch without paying for it. Defendant answered there had been a watercourse across the land of plaintiffs and others; that on account of the watercourse being filled in, floods resulted; and that pursuant to G. S. 1949, 24-401, *et seq.*, defendant was organized and proceeded to clear out the channel of the watercourse as the statute gave it the power to do and hence it was not liable to plaintiffs except where it went beyond the natural watercourse.

The entire defense depended on the pleaded fact that this was a natural watercourse and it was acting pursuant to the statute. Without the existence of a natural watercourse and without the statute, defendant would have been a trespasser on plaintiffs' land. Not only the pleadings but the statements of counsel during the pre-trial conference make it clear the real question at issue was whether there was a watercourse, and if so, whether the operations of defendant followed it. Thus counsel for plaintiff stated:

"The defendant Drainage District did construct the drainage ditch through the property of the plaintiff without acquiring the land by condemnation, dedication, gift, purchase or in any other manner. They just moved on the land and dug the ditch."

Further on counsel for plaintiffs stated:

"It is our position if there was a natural watercourse in this district, which of course in our judgment is absurd, that it is an immaterial thing, because they did not follow any well defined natural watercourse with banks. Their answer admits that there was no well defined banks over this land. They say that at sometime in the remote past, and which they do not designate, there had been, that it had been filled up, but they admit in their answer that there was no watercourse, natural watercourse, at the time this ditch was constructed across our properties. He contends that it is a vital issue to determine that order of the county commissioners is conclusive and is *res adjudicata* upon us as to the existence of a natural watercourse in that area.

We say it is immaterial. We will contend there was no natural watercourse there of any kind in any portion of the district; that the order of the county commissioners was entirely erroneous and put over in a hurry and without due consideration by our clients. But we say that this is not an issue of any important matter, because we say it is utterly immaterial because it is our contention, and we think we can prove definitely, that if there was a natural watercourse on there, it didn't exist at the point where they constructed that ditch."

It is true the trial court in a pre-trial order held:

"Again let me say, in the hope that it will limit and clarify the issues, that my present view of the law is that it makes litle difference whether or not a natural watercourse ran through the lands of the plaintiffs. The title to the watercourse, including the bed and the banks thereof, is in the plaintiff; and the taking thereof for public use, even by a corporation in which the plaintiff may be a stockholder or member, entitled the plaintiff to compensation. If I am wrong in this, I stand ready to be corrected."

However, in his opening statement counsel for plaintiffs said:

"It is the defendant's contention that they had every right to go on Mr. Wolf's land and remove obstacles that are wrongfully placed in the course of a natural watercourse which ran through this farm. Members of the jury, that contention is absolutely absurd. Never has there been a watercourse that ran across this farm."

Practically every witness introduced by plaintiffs testified there had never been a watercourse on plaintiffs' land.

Attention is next directed to the additional matter in instruction No. 4, after the first sentence just quoted. The trial court proceeded to tell the jury the bed and banks of a stream were private property and the owner might in the course of his farming operations cause the banks and channels to be erased and to alter its course so long as he did not alter its course as it entered his property from the land of another to the other's damage or did not change its course as it left his land onto the property of another to the other's damage, and that he might not obstruct or cause the obstruction of the flow of waters so that such waters would dam up and overflow the banks of others.

When considered with the first sentence of the instruction, this language could have no other effect than to confuse the jury. As has been demonstrated, the issue presented by the pleadings was whether there was a watercourse across plaintiffs' land so as to warrant the action taken by the district, pursuant to G. S. 1949, 24-401, *et seq*. The issue was not what a landowner could do with the bed of a stream running through his land. It was rather what

power and authority was conferred on the drainage district when it was organized. These are set out in G. S. 1953 Supp., 24-407. The district is first given power to exercise exclusive control over all watercourses and to widen, deepen, establish and regulate its channels. G. S. 1949, 24-434, provides for a liberal construction of the act, to encourage the improvement of natural watercourses and to protect land from damage by overflow and promote the public health, convenience and welfare. Here instruction No. 3 given by the court becomes important. By it the jury was told the district had power to take what action was deemed necessary by it to construct a drainage system to prevent the overflow and damage from overflow of all natural watercourses within the boundaries of the district, but in so doing it could not take private property for public use without just compensation to the owners. This instruction, taken together with the next one, when the jury was told the beds and banks of a non-navigable stream were private property, in effect told the jury that when defendants entered upon the bed of this watercourse and cleaned out the channel and removed the obstructions alleged to have been placed there, it was taking private property without compensation. This is not the law. It is true that the bed of a non-navigable stream is the private property of the person through whose land it flows. He holds it, however, subject to the police power. Defendant is a public corporation created for the purpose of preserving and protecting life and property from the ravages of floods.

In *Roby v. Drainage District,* 77 Kan. 754, 95 Pac. 399, we considered the constitutionality of Chapter 215, Laws of 1905, now G. S. 1949, 24-401, *et seq.* We pointed out that the organization of drainage districts was authorized by the legislature to carry out a plan for the benefit of public health and welfare. We quoted from *In re Madera Irrigation District,* 92 Cal. 296, 28 Pac. 272, as follows:

"'It may create municipal organizations or agencies within the several counties, or it may avail itself of the county or other municipal organizations for the purposes of such legislation . . . This principle is not contravened by the fact that it may even operate injuriously upon some of the individuals or proprietors of land within the district, or by the fact that there may be some who for personal motives may wish to resist the improvement. Such result is only a sacrifice which the individual makes to the general good in compensation for the advantages enjoyed by virtue of the social compact.'" (p. 759.)

The drainage district is an arm of the state created to carry into execution its police powers.

The obstructions claimed by defendant to have been placed in this watercourse were placed there, some of them in the 1930's. The filling in and leveling of banks was commenced then and continued, resulting in floods during the early 1950's. There was evidence that leveling of the banks was carried on in 1945, 47, 48 and 49. Defendant makes no claim but that it should pay for any land of plaintiffs other than the watercourse. It requested an instruction as follows:

"You are further instructed that if defendant in clearing the channel of said natural watercourse or in making other improvements in the drainage system of the district, appropriates land in addition to the natural watercourse, it must pay for such appropriation."

This instruction was based on a correct theory of the law of drainage districts. It should have been given. The district may not be compelled to pay for any land taken for this ditch which had before the filling in been a part of the bed or banks of the watercourse. It may, however, be compelled to pay for land taken outside the natural watercourse. It had the burden of proving what land was thus taken. This question was taken from the jury by giving of instruction No. 3 and No. 4, and the refusal to give requested instruction No. 5. This resulted in the action being tried on an erroneous theory. Giving those two instructions and the refusal to give requested instruction No. 5 was error.

Defendant next argues there was sufficient evidence of the existence of a watercourse to warrant the question being submitted to the jury. In view of the action of the trial court in taking this question from the jury, this is not important here. Furthermore, what we shall have to say on the next point renders it unnecessary to decide it.

Defendant next argues the trial court erred in permitting plaintiffs to deny the existence of a natural watercourse. It bases this argument on the finding of the board of county commissioners when the petition for the formation of the district was presented to it. G. S. 1949, 24-401, *et seq.*, provides for the submission of a petition asking for the organization of a drainage district. In that respect it is not much different from any of the many statutes providing for the organization of cities, school districts and any of the municipalities. There is provision for notice and a public hearing. G. S. 1949, 24-406, provides:

". . . And all declarations, determinations, findings, decisions and orders of such board of county commissioners so entered of record shall be conclusive on all persons, so that no matter or fact so determined shall ever be disputed by anyone, and such record, or a properly authenticated copy thereof, shall be conclusive evidence in all courts of the matters therein recited and of the corporate existence of such drainage district. . . ."

The petition stated first:

- "We, the undersigned, taxpayers residing within the district hereinafter described, state that the following described lands are subject to overflow or injury from overflow of a natural watercourse, which natural watercourse drains from the north part of said district to the south part thereof and empties into the Arkansas River, said natural watercourse is normally referred to in Finney County, Kansas, as the White Woman River; that the construction and maintenance of levies, drains and other works are necessary to drain such overflow and that such improvements and works will be conducive to the public health, convenience and welfare."

The district was then described by metes and bounds. One of plaintiffs signed the petition. No one argues but that plaintiffs' land was within the boundaries of the proposed district. The board of county commissioners found amongst other things that the allegations of the petition were true and ordered the organization of the district. Included in this finding of the truth of the petition was a finding that the "natural watercourse" drained from the north part of the district to the south part of it. Since plaintiffs' farm is the southernmost farm in the district and the district at that point is exactly the width of plaintiffs' farm, it can hardly be argued that the order of the county commissioners was not to the effect that a natural watercourse flowed through plaintiffs' farm. G. S. 1949, 24-406, provides this finding may not ever be disputed by anyone. This must be the law, otherwise any person dissatisfied with the conduct of its affairs could continually harass a new district by attacking the findings upon which it was based. This need only be applied to the organizing of school districts and cities to demonstrate the necessity for the rule.

What we held in *Kowing v. Douglas County Kaw Drainage Dist.*, 167 Kan. 387, 207 P. 2d 457, is in point here. One whose land had been included in a drainage district sought to take advantage of G. S. 1949, 24-498. That section was enacted in 1947 to provide a means by which one whose land had been harmed and not benefited by the improvements made by the drainage district could cause it to be detached from the district. We remarked the procedure for having that done followed substantially the procedure for organ-

ization of the district, that is, by a petition to the board of county commissioners, a hearing upon the petition and the fixing of a time and place for the hearing. The county commissioners heard this petition and ordered that the land be detached. The district appealed to the district court. There a motion to dismiss the appeal was denied. The court heard the whole matter *de novo* and found the land had been harmed and not benefited and ordered it detached. On appeal we pointed out first that the appeal should have been dismissed because not provided for by the statute. In addition we said:

"There is another reason, if one is needed, for the same result. It is the general rule that the creation, enlargement, or diminution of political districts or municipal corporations is a legislative function properly to be determined by a legislative body rather than by the court. By our constitution (Art. 2, § 21) the legislature may confer upon the board of county commissioners such power of local legislation and administration as it shall deem expedient. By the statute in question the legislature did confer upon the board of county commissioners the authority granted by the statute in question." (p. 391.)

This is a well considered opinion and settles the question whether a point once settled at the hearing before the board of county commissioners may be questioned in a collateral proceeding such as this action.

The result is the court erred in permitting plaintiffs to deny the existence of a watercourse across their farm. As a matter of fact, we are at somewhat of a loss to ascertain just what is the position of plaintiffs on this point. At some points in the record they take the position there was no watercourse there. In other places they argue it was immaterial since the defendant did not follow it with his ditch. For the latter argument to be good it would be necessary for plaintiffs to show at what point the defendant departed from it and to what extent. This was not attempted by them. In the view the trial court took of the action defendant was a trespasser on plaintiffs' land. The only question this had the effect of rendering meaningless is the drainage district statute.

Defendant next argues the trial court erred in denying it the right to introduce evidence on the source, description and nature of the entire natural watercourse in the district. The action was tried as though defendant was a corporation proceeding against the plaintiffs alone. Such was the wrong theory. The entire district, including plaintiffs, was organized pursuant to the statute to carry out a common purpose and to solve common problems. The

land of plaintiffs could not be set apart and its problems considered separate and apart from those of the rest of the land in the district. The evidence offered as to the source, description and nature of the watercourse and damages from its overflow should have been admitted.

Defendant next argues the trial court erred in admitting evidence on and giving instructions on consequential damages. The trial court withdrew from the consideration of the jury the plaintiffs' claim for allowance of the cost of bridges across the ditch and further instructed the jury that no allowance could be made for loss or prospective loss by erosion from water flowing through the ditch. This was correct. The defendant requested several instructions, which were denied. Some of them were:

### Instruction No. 3.

"You are instructed that the burden of proof is upon the plaintiffs, Walter F. Wolf and Myrtle B. Wolf, to prove by a preponderance of the evidence that they are entitled to damages for the appropriation of land by the defendant. It is not sufficient that they prove or attempt to prove that no natural watercourse existed at the place where the improvements are made. Since this court is bound by the findings of the Board of County Commissioners to the effect that the watercourse drains through the lands of the plaintiffs, the plaintiffs must show where and in what manner the course of the improvements departs from the natural watercourse through their lands."

### Instruction No. 5.

"You are further instructed that if Defendant, in clearing the channel of said natural watercourse or in making other improvements in the drainage system of the district, appropriates land in addition to the natural watercourse, it must pay for such appropriation."

### Instruction No. 7.

"You are instructed that in determining damages, if any, to the Plaintiffs, the Defendant is not liable for, is not required to pay, and you may not, therefore, consider any damages caused to the remaining lands of the Plaintiffs which would be the natural and probable result of the normal clearing of the channel of said watercourse and the removal of obstructions therefrom."

### Instruction No. 9.

"You are instructed that if you find that Plaintiffs are entitled to any damages for land appropriated by Defendant, you may offset such damages by any benefits you find have resulted to Plaintiffs by the construction of such improvements such as preventing or minimizing the overflow or danger from overflow of Plaintiffs' lands, the straightening of the channel of the watercourse, the improvement of the drainage system of Plaintiffs' lands and other similar benefits."

These instructions for reasons already set out in this opinion should have been given.

Defendant next argues the trial court erred in refusing to admit evidence and to instruct the jury on the question of estoppel. This is based on the fact that one of plaintiffs signed the petition upon which the district was formed. Once the action is tried on the theory outlined in this opinion it will be seen this argument is not good.

The judgment of the trial court is reversed with directions to grant defendant a new trial in accordance with the views expressed in this opinion.